[Cite as *In re S. & L. Children*, 2021-Ohio-1045.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: S. & L. CHILDREN.  :  APPEAL NO. C-200341
           TRIAL NO. F17-2619Z

          :

          :  *O P I N I O N.*

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 31, 2021

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Gretta M. Herberth*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Donita Parrish*, Assistant Public Defender, Appellee Guardian ad Litem for the Children,

*Cynthia S. Daugherty*, *In re Williams* Attorney for S.S.1 and S.S.2,

*Anzelmo Law* and *James A. Anzelmo*, for Appellant Mother.

**WINKLER, Judge.**

{¶1} The mother of S.S.1, S.S.2, W.L.1, and W.L.2 appeals the judgment of the Hamilton County Juvenile court granting permanent custody of her children to the Hamilton County Department of Job and Family Services ("HCJFS"). Mother challenges the grant of permanent custody on the ground that it was not in the children's best interest. The children's guardian ad litem and HCJFS maintain that a grant of permanent custody was in the children's best interest. After a careful review of the record, we conclude that the evidence supported the juvenile court's decision, and we therefore affirm its judgment.

## Facts and Procedural History

{¶2} W.L.1 and W.L.2 are the children of mother and W.L. Their younger half-siblings S.S.1 and S.S.2 are the children of mother and Q.S. HCJFS became involved with the family in late January 2018 after W.L.1, then 10 years old, disclosed to hospital staff that Q.S. had penetrated her with his penis vaginally and anally. Mother was married to Q.S. at the time and she refused to believe W.L.1. Mother's denial occurred despite mother's knowledge of Q.S.'s substantiated history of sexually abusing a child whom he fathered with an adult daughter of mother.

{¶3} After filing a complaint on January 31, 2018, HCJFS was awarded interim custody. Subsequently, the juvenile court adjudicated W.L.1 abused and all four children dependent. The children were committed to the temporary custody of the agency. W.L.1 and W.L.2 were placed with K.T., a paternal aunt, beginning in March 2018. S.S.1 and S.S.2 were initially placed together in three different foster homes, but since December 2018 have lived with W.L.1 and W.L.2 in K.T.'s home.

{¶4} After the initial disposition, a reunification case plan was put in place. The major issues preventing reunification with mother were her continued refusal to believe W.L.1, her continued relationship with Q.S., and, relatedly, her inability to protect the children in the future. The agency offered reunification services to the family. In June 2019, after the children had been in agency custody for more than the statutorily-defined-12-months-of-a-22-month period, HCJFS moved to modify temporary custody to permanent custody, with a goal of adoption. Mother moved to extend temporary custody.

{¶5} The children's guardian ad litem filed a report and recommended the grant of permanent custody. S.S.1 and S.S.2, who expressed to their guardian ad litem an interest in returning to their mother, were appointed an attorney pursuant to *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110.

{¶6} A permanent-custody hearing was held before a magistrate on two dates, November 19, 2019, and January 22, 2020. The evidence showed that both fathers failed to complete case-plan services and abandoned the children. Mother completed the ordered case-plan services. She was consistent with her mental-health treatment, including individual therapy through the Central Clinic, completed a parenting course in July 2019, and completed the group therapy program Parents and Children Together ("PACT") in early October 2019. The weekly PACT program was designed to provide counseling to the nonoffending parent of a child who had been sexually abused. Through no fault of mother, the program was not available until the summer of 2019.

{¶7} Mother also consistently attended the weekly visitation sessions with the children at the Family Nurturing Center. However, W.L.1 stopped attending the visitation in May 2019 because she felt "uncomfortable" around her mother.

3

{¶8}   During the pendency of the case, all four children formed a positive bond with their caregiver, K.T., with whom they had lived for an extended period of time.  K.T. tended to the children's behavioral and emotional needs by ensuring their participation in therapy, and their educational needs by setting up necessary individualized educational plans.

{¶9}   Much of the evidence at the permanent-custody hearing related to mother's relationship with Q.S. and whether mother believed W.L.1.'s claim of sexual abuse by Q.S. Historically, mother married Q.S. in 2012 and allowed him to have ongoing contact with the children even though she learned that same year he had sexually abused her grandchild.  Mother eventually divorced Q.S. in October 2019, but she did not start the process for the divorce until March 2019, more than a year after learning of W.L.1's sexual-abuse allegations and the agency's removal of her children from her custody.  Further, in her divorce petition, mother asked for shared parenting of Q.S.'s children and did not list his sexual abuse as a reason for the divorce.

{¶10}   Mother offered at the permanent-custody hearing that she had misunderstood the "shared parenting" designation on the divorce petition and only sought to allow supervised visitation for Q.S.  She also said that she would not let Q.S. around the children if she regained custody and had plans to move with the children to a safer neighborhood located a far distance from Q.S.

{¶11}   Mother also initially testified that she had always believed W.L.1's claim of sexual abuse and that she was not in a relationship with Q.S. even before the agency filed the complaint.  These initial assertions were undermined by other evidence, including her cross-examination.

{¶12}  For instance, mother eventually acknowledged that she was in "denial mode" at the outset of the case, despite her belief that Q.S. had previously abused her grandchild and her own painful experience of suffering sexual abuse as a child that her mother disbelieved.  Mother then claimed that her individual therapy and the PACT program had helped her overcome her doubts and had given her the tools to protect her children in the future.  Yet mother's individual therapy records indicated that during her extended period of individual therapy, she had not focused on the sexual abuse of her daughter and how that abuse affected her children. Further, mother acknowledged that her therapy notes from February and March 2019 reflected that Q.S. had only recently moved out, she was interested in having sexual relations with him after the separation, and she did not want a divorce. Finally, mother did not dispute claims that she met with Q.S. in the spring of 2019, but indicated that the purpose of the meetings was to obtain money from him to complete the divorce.

{¶13}  Candice Powell, the HCJFS caseworker with responsibility for much of the case through September 2019, testified that when she had case responsibility mother often expressed to her a need to see proof that W.L.1 had been abused. Further, Powell said her observations showed that mother continued to live with Q.S. through the early part of 2019.  Finally, Powell relayed that mother told her the reason why she was no longer with Q.S. was because "he left and [] he had a new girlfriend," making no mention of W.L.1's sexual-abuse allegations.

{¶14} Powell admitted she had not spoken with mother since mother finished the PACT program in October 2019.  But Powell also indicated that when she left the agency in September 2019, which was after mother started the PACT program, mother "still was not acknowledging what happened to her daughter" and

could not articulate the effect of what happened. Based on mother's behavior, Powell concluded that the provided services had not changed mother's attitude about believing W.L.1, and mother still lacked the ability to protect the children from future abuse by Q.S. or others.

{¶15} Kiswana Solomon, the HCJFS caseworker assigned to the case upon Powell's departure, testified at the January 2020 hearing. She said the agency believed mother was still having contact with Q.S. and confirmed that the agency's position on permanent custody had not changed. K.T., the children's caregiver, also testified on that date. She expressed her desire to adopt all four children.

{¶16} At the close of evidence, the children's guardian ad litem argued in favor of HCJFS receiving permanent custody, indicating that all four children wished to remain with K.T. S.S.1 and S.S.2's *In re Williams* attorney corroborated the guardian ad litem's statement with respect to those children's changed wishes.

{¶17} Subsequently, the magistrate issued a decision denying mother's motion to extend temporary custody and granting HCJFS's motion requesting permanent custody of the children. Importantly, the magistrate noted that he "d[id] not find [mother's] testimony credible when weighed against the testimony of the HCJFS caseworker." The magistrate found applicable the 12-of-22-months condition of R.C. 2151.414(B)(1)(d) and the four circumstances necessitating a best-interest finding under R.C. 2151.414(D)(2).

{¶18} Mother filed an objection, challenging the magistrate's best-interest determination. She argued that R.C. 2151.414(D)(2) did not apply, and the best-interest factors of R.C. 2151.414(D)(1) weighed in favor of returning the children to her custody. D.L. filed an objection but subsequently withdrew it. Because of the

Covid-19 pandemic, the juvenile court ordered the parties to submit written arguments.

{¶19} On August 19, 2020, the juvenile court issued a judgment adopting the magistrate's decision granting permanent custody to the agency. In a written decision overruling mother's objection, the court agreed with mother that R.C. 2151.414(D)(2) did not apply, because the two-year time limitation was not met. The court determined, however, that permanent custody was in the children's best interest after considering the factors set forth in R.C. 2151.414(D)(1).

## Analysis

{¶20} In mother's sole assignment of error, she argues the juvenile court's judgment awarding permanent custody of the children to HCJFS was not supported by the evidence. Before the juvenile court could grant the agency's motion for permanent custody, it was required to find, by a clear-and-convincing standard, that one of the factors in R.C. 2151.414(B)(1)(a)-(e) applied and that the grant of permanent custody was in the children's best interest. *See* R.C. 2151.414(B)(1). Mother concedes the state proved the 12-of-22-months factor of R.C. 2151.414(B)(1)(d), but challenges the best-interest finding.

{¶21} When determining the children's best interest, the juvenile court was required to consider the factors specifically delineated in R.C. 2151.414(D)(1)(a)-(e), as well as "all" other "relevant factors." Here, the record demonstrates the court properly considered and weighed the relevant factors.

{¶22} As for the factor focusing on the children's interactions and interrelationship with others, the juvenile court noted that mother was the children's primary caregiver before they entered agency care and she visited consistently with W.L.2, S.S.1, and S.S.2 as required by the case plan. The court also discussed,

however, mother's undisputedly estranged relationship with W.L.1, resulting from mother's "repeated[] cho[ice] [of] her relationship with [Q.S.] over the safety of her [c]hildren for most of the time the case ha[d] been pending."

{¶23} Additionally, the court noted that neither father had maintained a relationship with the children. Conversely, the court emphasized that the children were doing well out of mother's care and were bonded to K.T. Of further significance, the court credited K.T.'s diligent efforts to address all of the children's needs.

{¶24} As for the factor that requires consideration of the "wishes" of the children, the court found that all of the children had expressed through their guardian ad litem a desire to remain in the care of K.T. S.S.1 and S.S.2's *In re Williams* attorney, who corroborated the guardian ad litem's representation in the trial court, maintains on appeal that affirmance of the juvenile court's decision is consistent with these children's wishes. Mother does not challenge this representation.

{¶25} As for the factor involving the children's custodial history, the court noted that the children had been in the agency's temporary custody for more than 12 consecutive months. All four children had been in K.T.'s care for a "significant period of time," even though S.S.1 and S.S.2 were first placed in three foster homes.

{¶26} The final statutory best-interest factor relevant to the juvenile court's termination of mother's parental rights involves the children's need for a legally secure permanent placement, and whether that type of placement could be achieved without a grant of permanent custody. The juvenile court found the children were in need of a legally secure permanent home and that placement could not be achieved without a grant of permanent custody. The court explained that the children could

not be placed with any parent within a reasonable time or at all due to the parents' failure to remedy the issues that led to the children coming into agency care, no petitions for legal custody were pending, and K.T. desired to adopt the children.

{¶27} Mother does not challenge the court's finding that the children were in need of a permanent home or that the children could not be placed with their fathers. She argues the court's concern that she had not remedied the issues that led to the children coming into agency care was contrary to the evidence, as she had gained the necessary ability to protect her children.

{¶28} In support of her claim that the children can be returned to her, mother cites evidence undisputedly showing she completed her case-plan services. She also cites her testimony that she believes W.L.1's abuse allegations and would not allow her children to be around Q.S., from whom she is now divorced.

{¶29} Mother's testimony, however, was replete with contradictions and conflicted with testimony from the caseworkers. Moreover, the facts showed that for many years mother continued her marriage with Q.S. and allowed him to be around her children even though she believed he had sexually abused at least one of her grandchildren. Mother then refused to believe W.L.1's allegation of sexual abuse and defended Q.S. Despite the long-term provision of individual therapy, mother did not divorce Q.S. or terminate her relationship with him until he engaged in a new relationship. Thus, even though mother completed case-plan services, mother failed to gain the necessary insight to provide a permanent and safe home for the children.

{¶30} As the juvenile court noted when reviewing mother's objection, the magistrate was in the best position to judge the credibility of the witnesses and the magistrate's resolution of the facts against mother was not unfounded.

**{¶31}** Finally, mother claims that the evidence does not support the court's determination that K.T. was committed to adopting all four children, if the opportunity arose. In support, mother cites Powell's testimony from November 2019 relaying that K.T. had previously indicated she was not ready to commit to caring for S.S.1 and S.S.2 long term. But in January 2020, K.T. testified that she desired to adopt all four children, including S.S.1 and S.S.2. Thus, the juvenile court's conclusion that K.T. desired to adopt all four children is amply supported by the record.

## Conclusion

**{¶32}** The juvenile court ultimately found in light of all the evidence that an award of permanent custody to HCJFS was in the children's best interest. In arriving at the conclusion, the juvenile court applied the relevant statutory factors and made factual findings that were based upon clear-and-convincing evidence. *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. This is not a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of the children to be placed in the permanent custody of HCJFS. *See id.* at ¶ 16. Because the statutory factors were met, we hold the juvenile court did not err in granting permanent custody to HCJFS. Accordingly, we overrule the assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**BERGERON, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.